# IN THE COURT OF APPEALS OF IOWA

No. 25-0424
Filed June 18, 2025

IN THE INTEREST OF T.K., R.W., J.C. and B.C.,
Minor Children,

C.C., Mother,
    Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Judge.

A mother appeals the juvenile court's order terminating her parental rights to four children. **AFFIRMED.**

Myia E. Steines of Clemens, Walters, Conlon, Runde & Hiat, L.L.P., Dubuque, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Kristy L. Hefel, Public Defenders Office, Dubuque, attorney and guardian ad litem for minor children.

Considered without oral argument by Greer, P.J., Chicchelly, J., and Telleen, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**TELLEEN, Senior Judge.**

A mother appeals the termination of her parental rights to four children—born in 2014, 2017, 2021, and 2023—pursuant to Iowa Code section 232.116(1)(f) and (h) (2025). She contends that termination is not in the children's best interests and that the juvenile court should have applied a permissive exception under Iowa Code section 232.116(3). She also argues that the juvenile court erred by declining to give her additional time to work toward reunification and by denying her request to transfer guardianship of the children to their grandmother. Our review is de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

## I.    Background

The Department of Health and Human Services (HHS) first became involved with this family in April 2021 following an episode of domestic violence between the mother and her then-paramour, J.C. Sr., who is a registered sex offender. A no-contact order entered, and HHS provided the mother with a referral for supportive services. But by the following year, J.C. Sr. had resumed his residence with the family, and the mother was pregnant with their third child.[1] At some point, the couple wed.

In summer 2022, a spree of dangerous home escapes by eight-year-old T.K.—later diagnosed with autism—led to a founded assessment for inadequate supervision. The mother participated in a parenting evaluation, which found her adaptive functioning skills were limited by her intellectual disability and mental-health disorders. A psychologist "*strongly* recommended" the mother begin twice-

---

[1] J.C. Sr. is father to the three youngest children at issue in this case. The juvenile court terminated his parental rights to those children. J.C. Sr. does not appeal.

weekly behavioral therapy, among other interventions. The psychologist also recommended that the mother not be left to care for the children alone due in part to T.K.'s special needs.

In December 2022, the juvenile court transferred custody of the older two children to HHS for placement with their maternal grandmother, citing ongoing concerns about inadequate supervision, an unsanitary home, and violations of J.C. Sr.'s sex offender restrictions. The younger two children were removed in September 2023 following reports that the mother left them unattended while she smoked outside. While looking into those allegations, HHS also learned that three-month-old B.C had been diagnosed with failure to thrive. The mother informed a caseworker that she sometimes mixed B.C.'s formula with extra water, believing this would help "fill him up." Efforts to coach her toward regular feeding were unsuccessful, and a follow-up appointment with B.C.'s primary care provider ended with the child being taken by ambulance to an emergency room. He drank eleven ounces of formula in transit and another eight at the ER.

Following an eviction in October 2023, the mother relocated from Hardin County to a homeless shelter in Dubuque, more than two hours away. Upon his release from jail for registry violations, J.R. Sr. followed. Dispositional review orders entered during this period note the "parents seem[ed] more focused on each other than their children" and that the mother had stopped engaging with HHS services. The grandmother and children also moved to the Dubuque area to facilitate visitation, and the mother lived with them for a few months in the summer of 2024. She returned to a shelter in the fall but continued to visit the children under the grandmother's supervision. Meanwhile, domestic violence between the

mother and J.C. Sr. continued. An altercation on New Year's Day 2025 left her with a concussion, which the mother did not report to the police.

The State petitioned for termination. At a hearing in January 2025,[2] an HHS caseworker testified that the mother had failed to make significant progress with her parenting despite several years of services. Supervised interactions with the children remained "chaotic," and she was unable to attend to their needs without assistance. The mother had yet to engage in the behavioral therapy recommended in her 2022 parenting evaluation. HHS also remained concerned by the mother's relationship with J.C. Sr. Although the mother was reportedly preparing to seek a divorce, the caseworker testified that "every step so far ha[d] been initiated by the [shelter staff]," and that he believed the mother would rekindle the relationship as soon as HHS was "out of the picture."

The mother requested a six-month extension to work towards reunification, pointing out that HHS involvement would continue in either event due to the recent removal of her newborn. She alternatively asked the court to transfer guardianship to the children's grandmother, with whom they remained placed at the time of the hearing. But in February, a break-up between the grandmother and her paramour left the grandmother with insufficient income, unstable housing, and no transportation. Without alerting HHS, she moved the children back to Hardin County. Caseworkers located the family in a relative's crowded home, where they observed hazardous materials, excessive clutter, "sagging floors," and mold. The

---

[2] The State filed its petition in October 2024. However, the case was continued until January 2025 to accommodate the birth and hospitalization of a fifth child, who is not at issue here.

children were removed to foster placements. At a subsequent hearing on the State's motion to reopen the record, an HHS witness testified that the grandmother had yet to find a home that was suitable for the children.

In a thorough written order, the juvenile court found the State had established grounds for termination under Iowa Code section 232.116(1)(f) and (h), citing the mother's "inability to . . . appropriately care for the children" and her failure to "keep [them] safe from [J.C. Sr.]." Based on the mother's lack of progress to date, the court found an extension of time was not warranted and deemed a guardianship with the grandmother "no longer an option." It terminated the mother's parental rights and appointed HHS as guardian and custodian to all four children. This appeal followed.

## II.    Analysis

In reviewing the termination of parental rights, we follow a three-step analysis asking (1) whether a statutory ground for termination is satisfied, (2) whether termination is in the best interests of the children, and (3) whether a statutory exception should be applied to avoid termination. *L.B.*, 970 N.W.2d at 313; *see also* Iowa Code § 232.116(1)–(3). We need only consider those steps challenged on appeal. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Here, the mother does not contest the juvenile court's finding that the State established grounds for termination under Iowa Code section 232.116(1)(f) and (h). So, we turn directly to the best-interests inquiry.

When determining whether termination of parental rights is in the best interest of a child, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the

physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We also consider "whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition" and "the child's integration into a preadoptive home." *In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020) (cleaned up). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41.

On our de novo review, we agree with the juvenile court's finding that "[t]hese children have been exposed to nothing but chaos, instability, domestic violence, and improper supervision for the majority of their lives." And each of them has spent much longer awaiting a permanent change than our statute requires. *See* Iowa Code §§ 232.116(1)(f)(3) (twelve months), 232.116(1)(h)(3) (six months). As of January 2025, T.K. and R.W. had been removed from their mother's custody for over twenty-four months, and J.C. and B.C. had been removed more than fifteen. Meanwhile, the mother lost her housing, failed to extricate herself from an abusive relationship, and declined to participate in behavioral therapy that was prescribed to improve her parenting abilities. An HHS caseworker testified that he would "be very concerned for [the children's] safety" if they were left alone with their mother even "for a couple hours." These children's lives cannot remain on hold while they await a caretaker who is equipped to meet their basic needs. Termination will facilitate the long-term safety and stability that they deserve.

The mother primarily argues that termination is not in her children's best interests because it may entail their separation from one another. Upon removal from their grandmother's care, the children were placed in different foster homes—partly due to the special needs of T.K. and J.C.—and a child-in-need-of-assistance case remained pending for their newborn sister. An HHS witness acknowledged "we could very well be looking at five different homes for five different siblings." That, of course, is not an outcome our system seeks to achieve. *See In re W.M.*, 957 N.W.2d 305, 314 (Iowa 2021) ("It is usually in the best interests of siblings to remain together."). However, sibling separation is not always determinative of a child's best interests. *See, e.g.*, *In re G.B.*, No. 19-1176, 2019 WL 4301593, at *3 (Iowa Ct. App. Sept. 11, 2019); *In re T.B.,* No. 18-0618, 2018 WL 3057948, at *4 (Iowa Ct. App. June 20, 2018). Considering all of the circumstances in this case, we agree with the opinions of HHS, the guardian ad litem, and the juvenile court that the best interests of the children will be better served on a path towards permanency, even if that path does not lead to a single home.[3]

Turning to the third step in our analysis, the mother contends her parental bond with the children supports a permissive exception to termination. Under Iowa Code section 232.116(3)(c), a parent's rights may be spared if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." The mother bears the burden to prove this exception applies. *In re W.T.*, 967 N.W.2d 315, 322 (Iowa

---

[3] While we recognize a single home may not be found, we encourage HHS to consider in any permanent placement arrangement an emphasis on maintaining contact between these children, even if they are in separate homes, to the extent possible.

2021). To that end, she points to testimony by the HHS caseworker, family service provider, and grandmother—each of whom agreed that the children are bonded to the mother. However, the record is not entirely consistent with these witnesses' observations. The guardian ad litem's pre-hearing report noted that T.K. expressed a preference to remain in the care of his grandmother and her former paramour, rather than be returned to his mother. R.W. did not comment in response to the same question. And J.C. and B.C. have been removed from their mother's care for the majority of their short lives.

In any event, the important question is not whether a bond exists, *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021), but "whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs," *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). Other than her testimony that the children "would not take it very well" if she was no longer involved in their lives, the mother has failed to show that severing their emotional bond would leave the children uniquely disadvantaged. *See In re A.C.*, No. 25-0418, 2025 WL 1324168, at *3 (Iowa Ct. App. May 7, 2025) (noting "there will undoubtedly be some heartache" in the termination of parental rights, but finding the parental-bond exception did not apply where "adoption results in a net advantage to the children"). We decline to apply the permissive exception under section 232.116(3)(c).

The mother also argues that a six-month extension of time could have changed the course of this case. A juvenile court may forestall termination if it finds "the need for removal 'will no longer exist at the end of the additional six-month period.'" *W.T.*, 967 N.W.2d at 323 (quoting Iowa Code § 232.104(2)(b)).

The mother contends such a finding is supported by her progress in the months preceding the termination hearing. She maintained steady employment, signed up for a housing waitlist, regularly met with service providers, and kept in "near daily contact" with the children. We commend these efforts. But they do not justify another half-year of limbo for the children.

"While . . . the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (citation omitted). A parent thus "cannot wait until the eve of termination . . . to begin to express an interest in parenting." *Id.* at 495. Here, the mother received more than twice the time required by statute to address the domestic violence and supervision issues that required the children's removal. Nevertheless, violent encounters with J.C. Sr. continued in the weeks preceding the hearing, and visits with the children remained chaotic. Housing disruptions for both the mother and grandmother promised only to hinder further progress. Given the long trajectory of this case, we believe the juvenile court appropriately denied the mother's request for more time.

Finally, we reject the mother's contention that the juvenile court should have transferred guardianship to the grandmother in lieu of terminating parental rights. It is true that a transfer of guardianship is a permanency alternative permitted by statute, *see* Iowa Code §§ 232.117(5), 232.104(2)(d)(2), and we have occasionally found this option to better serve a child's interests, *see In re B.T.*, 894 N.W.2d 29, 35 (Iowa Ct. App. 2017). But as a general rule, "a guardianship is not a legally preferable alternative to termination." *In re W.M.*, 957 N.W.2d at 315 (citation

omitted). Here, the record is clear that the children's grandmother was no longer equipped to care for them at the time of termination, which is just one of reasons why a transfer of guardianship would not advance permanency in this case. *See In re A.S.*, 906 N.W.2d 467, 478 (Iowa 2018) (questioning whether transferring guardianship and custody to grandparents, who expressed dubious caretaking judgment, "would actually provide more stability and safety for the child"); *W.M.*, 957 N.W.2d at 315 (noting a guardianship would not guarantee stability where it remained subject to challenge by the parent).

## III.    Conclusion

For the reasons discussed, we find termination of parental rights is in the best interests of the children. We decline to apply a permissive exception based on the parent-child bond, and we agree with the juvenile court that a six-month extension of time was not warranted. Further, a guardianship with the children's grandmother was not appropriate at the time of termination. We therefore affirm the order of the juvenile court.

**AFFIRMED.**